*CJ*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )       No. 02 C 4822 |
| | ) |
| | ) |
| BDO SEIDMAN, LLP, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT S. CUILLO, et. al., | ) |
| | ) |
| Intervenors. | ) |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On July 9, 2002, the Internal Revenue Service ("IRS"), filed a petition with the court to enforce twenty civil summonses served on BDO Seidman, LLP, ("BDO"), a public accounting and consulting firm. (Dkt. No. 1.) The summonses are part of an IRS investigation into BDO's potential involvement in allegedly abusive tax shelters. BDO and a number of BDO's clients ("Intervenors"), asserted a variety of privilege claims in response to the IRS summonses. This court has previously held that the federally authorized tax practitioner privilege, ("tax practitioner privilege"), I.R.C. § 7525[1], does not prevent the disclosure of the Intervenors' identities, United States v. BDO Seidman, LLP, No. 02 C 4822, 2003 WL 932365 (N.D. Ill. Feb. 5, 2003), aff'd, 337 F.3d 802 (7th Cir. 2003),

---

[1]Statutory citations to "I.R.C." are to the Internal Revenue Code, Title 26 of the United States Code.

1

cert. denied sub nom. 124 S. Ct. 1410 (2004), and that the attorney-client privilege and the work product doctrine protected BDO from disclosing 104 documents to the IRS. United States v. BDO Seidman, LLP, No. 02 C 4822, 2004 WL 1470034 (N.D. Ill June 29, 2004).

The Intervenors withheld from the IRS' scrutiny 267 documents on the asserted basis that the documents are privileged under the tax practitioner privilege, set forth in 26 U.S.C. § 7525, the common law attorney-client privilege as well as the work product doctrine. Pursuant to this court's order of July 15, 2004, (Dkt. No. 131), the Intervenors have submitted a privilege log identifying the privilege assertion for each of the 267 withheld documents and have submitted copies of the withheld documents themselves for this court's in camera review.[2]

---

[2] The documents and an associated privilege log were submitted on July 29, 2004 for in camera review by Intervenors Robert S. Cuillo, Gary Ervin, Robert Ervin, Timothy Ervin, Richard Garman and Johnna Coats, Chand Gupta, DRG Irrevocable Trust, DSG Irrevocable Trust, Jai N. Gupta, Jai N. Gupta Revocable Trust, Ram Gupta, Shashi A Gupta, Shashi A Gupta Revocable Trust, Billy L. "Dwayne" Hawkins, Shahid Khan, Ray Lane, R.K. Lowry, Jr., John P. Moffitt, Arlene Nussdorf, Glenn Nussdorf and Claudine Strum, Glenn Nussdorf Trust, Ruth Nussdorf, Stephen and Alicia Nussdorf, Stephen Nussdorf Trust, Quality King. The Intervenors in their brief of August 12, 2004 categorize the documents submitted for in camera review as opinion letters, memorandum, drafts of opinion letters and memorandum, handwritten notes, emails, faxes, letters, summaries, type written notes and schedules.

The documents were divided and identified with a unique document code for tracking purposes. For example, the first document for Robert S. Cuillo was given a document code of "A-1," the second document for Robert S. Cuillo had a document code of "A-2," and so forth. Documents for Gary Ervin are labeled "B-xx," Robert Ervin documents are "C-xx," and so forth with a new letter assigned to each Intervenor. Each page submitted also included an individual Bates number.

The privilege log is presented in chart format with the following columns: Doc. Code, Intervenor Last Name, Intervenor First Name, Bates Range, Doc. Date, Document Type, No. Pgs., Author, Author's Employer / Position, Addressee, Addressee's Employer / Position, Copies Provided To, Why Document Created, Grounds.

Intervenors R.K. Lowry, Jr. and John P. Moffitt, provided two additional documents for in camera review. (Dkt. Nos. 137, 138.) Intervenors Gary Ervin, Timothy Ervin, Robert Ervin,

This court has carefully reviewed each of the 267 withheld documents in camera and considered each of the arguments presented by each of the parties. For the reasons set forth below, this court finds that the withheld documents submitted by the Intervenors are each privileged with the exception of the document identified as A-40 in which this court finds a prima facie showing of the crime-fraud exception has been made. The Intervenors do not have to disclose the withheld documents that this court has found to be privileged to the IRS.[3]

## BACKGROUND

The IRS filed a petition on July 9, 2002 pursuant to I.R.C. §§ 7402 (b) and 7604(a) seeking judicial enforcement of twenty civil summonses served on BDO as part of an IRS investigation into whether BDO may be liable under I.R.C. §§ 6707 and 6708 for promoting abusing tax shelters from 1995 through 2002. (Dkt. No. 1). BDO challenged the summonses arguing the following: (1) that the investigation did not have a legitimate purpose, (2) the summonses were overbroad and issued in bad faith, and, (3) that the requested information was already in IRS' possession or the information was not relevant to the investigation. United States v. BDO Seidman, LLP, 337 F.3d 802, 806 (7th Cir. 2003). BDO also asserted tax practitioner privilege under I.R.C. § 7525 by providing two privilege logs, one log 86 pages long listing 826 documents, and the other 42 pages

---

(continued) Chand Gupta, DSG Irrevocable Trust, Ram Gupta and DRG Irrevocable Trust withdrew their privilege claims and the remaining Intervenors provided an amended privilege log on September 10, 2004. (Dkt Nos. 141, 142.) The government was granted leave to file a sur-reply, with a final reply from the remaining Intervenors, to address what impact, if any, the withdrawal of the intervenors had on the remaining Intervenors' privilege claims. (Dkt. No. 144).

[3] In issuing this opinion, the court has considered the additional authority provided by the parties after the completion of briefing including the Government's Motion for Leave to Cite Additional Authority filed on March 15, 2005.

long listing 293 documents. <u>United States v. BDO Seidman, LLP</u>, 225 F. Supp. 2d 918, 920 (N.D. Ill. 2002) (Shader, J.). Judge Shader ruled in October 2002 that the IRS had met its burden of showing that the summonses were issued in good faith and BDO had failed to show that the enforcement of the summonses would constitute an abuse of discretion. 377 F.3d at 806 (citing 225 F. Supp. 2d at 920). Judge Shader ordered BDO to produce all documents required under the summonses except for the 1119 documents that had been previously submitted for <u>in camera</u> review. Judge Shader referred to Magistrate Judge Ashman the responsibility of performing a document-by-document <u>in camera</u> review of the 1119 documents where BDO had asserted the tax practitioner privilege.

After Judge Shader's first opinion, a group of BDO client sought to intervene into the case. 337 F.3d at 807. BDO had informed a certain number of its clients that it would be producing documents to the IRS, and in turn these clients became concerned that their identity would be revealed to the IRS. <u>Id.</u> Two sets of BDO clients, John and Jane Does ("Does"), and Richard and Mary Roes ("Roes"), filed an emergency motion with the district court to intervene in the proceeding pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure ("Rules"). (<u>Id.</u>) BDO's clients argued that the disclosure of their identity would violate the tax practitioner privilege under I.R.C. § 7525, but acknowledged that there was nothing privileged in the contents of the documents that BDO was attempting to turnover to the IRS. (<u>Id.</u>) Judge Shader denied the Does and Roes' motion to intervene on November 1, 2002, (Dkt. No. 44), and the Does and Roes appealed to the Seventh Circuit.

The Seventh Circuit initially ordered a limited remand to the district court for the purpose of entering more extensive findings regarding the disputed documents. <u>United States v. BDO</u>

4

Seidman LLP, Nos. 02-3914, 02-3915, 2002 WL 32080709 at *1 (7th Cir. Dec. 18, 2002). The Seventh Circuit's limited remand instructed the district court to enter findings by January 21, 2003 based on an in camera review of the documents over which the Does and Roes had asserted § 7525 privilege and enter findings that consider the "totality of the circumstances." Id. (citing In re Grand Jury Proceedings, 220 F.3d 568, 572 (7th Cir. 2000). The district court's evaluation on remand of the totality of the circumstances was ordered to include, but not be limited to, the following: "(1) the purpose and history of BDO's representation of the [Does and Roes] with respect to the tax shelter transaction at issue; (2) whether, in light of the purpose and history of BDO's representation as well as the description of the transactions in the IRS summonses, revealing the [Does and Roes'] identities to the IRS necessarily would reveal the [Does and Roes'] motive for seeking tax advice or the substance of that advice; (3) whether the IRS could determine that the [Does and Roes'] had participated in the transactions without obtaining their names from BDO; and (4) whether any of the documents at issue were generated for the purpose of preparing tax returns. Nos. 02-3914, 02-3915, 2002 WL 32080709 at *1.

Through the district court's internal operating procedures, this case was reassigned to this court on February 3, 2003. (Dkt. Nos. 63, 64, 72). This court issued a memorandum opinion and findings on February 4, 2003 making the further findings as instructed by the Seventh Circuit's limited remand of December 18, 2002 for Doe 1 through Doe 56 and Roe 1 through Roe 42. United States v. BDO Seidman, LLP, No. 02 C 4822, 2003 WL 932365 (N.D. Ill. Feb. 5, 2003). The memorandum opinion discussed the law surrounding I.R.C. § 7525 and how the tax practitioner privilege may apply to a potential disclosure of an individual's identity. Id. at *1. Among the findings made by this court in its memorandum opinion of February 4, 2003, this court held: (1) the

5

identity-privilege did exist under § 7525; (2) the tax practitioner privilege under § 7525 did not include communication regarding tax return preparation; (3) the court had to perform a document-by-document review to determine whether the communication was for the purpose of preparing the client's tax return (a communication that is not within the § 7525 privilege); (4) the court had to determine on a document-by-document basis whether the Does and Roes had waived the § 7525 privilege; (5) the court could not and need not determine whether the crime-fraud exception applied based on the record that was present before it. Id.

This court's February 4, 2003 memorandum opinion also provided two general observations about a number of the documents examined by the court during the in camera review. First, this court noted that many of the Does and Roes had documents entitled "Confidentiality Agreement" and contained language that "BDO shall provide, and Recipient shall receive, Confidential information ... for the purpose of providing the Recipient the required information to prepare ... income tax returns." Id. at *3. This court consequently observed that these communications would not be covered under the § 7525 privilege. Id.

Second, this court noted that many of the reviewed documents were entitled "Consulting Agreement" and those documents contained the language that "BDO's Services hereunder do not include ... any legal and/or tax opinions regarding any strategies that may be implemented, and has advised [the BDO client] to retain a law firm for legal and/or tax opinions on any strategies or transactions entered into." Id. This court held that the "No Warranty" language contained in the consulting agreement documents defined the relationship between BDO and the client in a manner different than the relationship in a traditional attorney-client relationship and consequently would not be covered under the § 7525 tax practitioner privilege. Id. at *4.

6

The Seventh Circuit reviewed this court's February 4, 2003 findings in its July 23, 2003 decision. United States v. BDO Seidman, LLP, 337 F.3d 802 (7th Cir. 2003). The Seventh Circuit summarized this court's February 4, 2003 stating

> [T]he district court found that 133 of the documents it had reviewed established that BDO's communications with the 55 Does had not been for the purpose of providing tax advice, and were therefore not privileged. Furthermore, the court concluded, 28 of the documents were generated for the purpose of preparing tax returns, another unprivileged category of communication. Finally, with respect to 30 unidentified clients who sought intervention, the court was unable to make findings because no confidentiality agreement, consulting agreements or engagement letters had been produced on their behalf.

Id. at 808.

The Seventh Circuit went on to review the regulatory context surrounding the IRS' enforcement efforts against tax shelters, the IRS' ability to issue summonses and the tax practitioner privilege under I.R.C. § 7525. Id. at 808-12. The Seventh Circuit concluded that the Does and Roes could not establish a colorable claim of privilege under I.R.C. § 7525 that would stop the disclosure of their identities. Id. at 812. The Does and Roes had not, according to the Seventh Circuit, established that a confidential communication would be disclosed if their identities were revealed. Id. Furthermore, due to the requirement that anyone who organizes or sells an interest in a tax shelter is required to maintain a list of the identity of the people to which the interest was sold, I.R.C. § 6112, the Does and Roes could not have an expectation of confidentiality in their identity, a required element for any privilege claim. Id. Thus, the Seventh Circuit affirmed the district court's denial of the Does and Roes motion to intervene issued by Judge Shader on November 1, 2002. The Supreme Court then denied the Does and Roes' petition for a Writ of Certiorari on February 23, 2004. Roes v. United States, 124 S. Ct. 1410 (2004). With the July 23, 2003 decision from the Seventh Circuit and denial of the petition for Writ of Certiorari, the litigation had concluded on the question of the

7

disclosure of the identity of BDO's clients with the answer that the disclosure of the identity of the Does and Roes was not protected by the tax practitioner privilege under I.R.C. § 7525.

BDO then asserted privilege claims with regard to 110 documents under attorney-client privilege and/or the work product doctrine. BDO did not, however, assert the tax practitioner privilege. This court held on June 29, 2004, after performing an in camera review of each of the disputed documents, that 104 of the 110 documents were protected by either the attorney-client and/or work product privilege. United States v. BDO Seidman, LLP, No. 02 C 4822, 2004 WL 1470034, at *5 (N.D. Ill. June 29, 2004).

In reviewing the 110 documents, in camera in June 2004, this court considered three arguments made by the IRS, two of which are pertinent to the present discussion. First, the IRS argued that the communications between the law firms and BDO were not for the purpose of legal advice because the law firms were "co-promoters" or marketing partners with BDO. Id. at *1. Second, the IRS asserted that privilege was not applicable because the crime-fraud exception applied. Id. The court considered both of these arguments in June 2004 but found that there was not sufficient evidence to find that the law firms were co-promoters not providing legal advice, or that BDO and the law firms were engaging in a crime or fraud so that BDO should be deprived of the protections of the asserted privileges. Id. at *2.

This court then allowed the BDO clients, who had previously been identified, ("Intervenors"), to intervene on July 15, 2004 (Dkt. No. 131) so they could assert objections to BDO's disclosure of documents to the IRS in response to the IRS' motion to compel production of documents of March

8

31, 2004 (Dkt. No 101).[4] This memorandum opinion and order addresses the privilege claims made by the Intervenors.

## ANALYSIS

The dispute before this court is whether the Intervenors' assertion of privilege can prevent the production of the withheld documents submitted for in camera review to the IRS. The parties have presented a variety of arguments. The Intervenors claim that the documents are protected from disclosure under the tax practitioner privilege, attorney-client privilege and/or the work product doctrine. The IRS asserts that there is no privilege available for these documents because the documents were not produced for the purpose of obtaining or providing tax advice but instead were part of a pre-packaged product of abusive tax shelters that BDO had developed, marketed and

---

[4] In the United States' Concurrence in the Intervenors' Motion to Intervene and Challenge to Claims of Privilege, (Dkt. No. 129), the government stated that BDO produced to the IRS on June 30, 2004 the remaining BDO client documents where the Intervenors had not asserted a claim of privilege. Although the government did not provide a number of the total documents provided, the court estimates the total number of documents provided to the IRS, and to which the Intervenors did not assert a claim of privilege, to be well in excess of 1000 documents.

The court reaches the figure of "in excess of 1000 documents" based on the fact that the 267 documents provided by the Intervenors for this court's in camera review were submitted in a total of seven boxes. This results in a calculation of approximately 38 documents per box submitted to this court. The court then multiplied the 38 documents per box by the 28 box figure provided in the government's filing resulting in a number of 1064. The court recognizes that the 1064 figure is calculated based on an assumption that the document and box type provided for this court's in camera review are the same type as the document and boxes provided to the government. The court decided to use the phrase "in excess of 1000 documents" in recognition of its assumptions and estimations.

It should also be noted that the figure of "in excess of 1000 documents" only considers documents involving the Intervenors and does not include BDO's internal documents that BDO has previously provided to the IRS. Although the court does not know the total number of documents provided by BDO and the Intervenors to the IRS during the IRS' multi-year investigation, the court believes the total document figure to be significantly larger than 1000.

implemented for the unlawful purpose of assisting the Intervenors evade the payment of federal income taxes. The court will briefly discuss the law of the attorney-client, tax practitioner and work product privileges and then turn to the parties' arguments.

1. Attorney-Client, Tax Practitioner and Work Product Privileges

The Seventh Circuit follows the classic definition of attorney-client privilege first articulated by Dean Wigmore:

> (1) Where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communication related to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

United States v. BDO Seidman, LLP, No. 02 C 4822, 2004 WL 1470034, at *1 (N.D. Ill. June 29, 2004) (citing United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997)). "The party seeking to invoke the privilege bears the burden of proving all of its essential elements." Rohr-Gurnee Motors, Inc. v. Patterson, No. 03 C 2493, 2004 WL 422525, at *3 (N.D. Ill. Feb. 9, 2004). "The purpose of the privilege is to encourage full disclosure and to facilitate open communication between attorney and their clients." United States v. BDO Seidman, LLP, 337 F.3d 802, 810 (7th Cir. 2003) (citing Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998)). "However, because 'the privilege has the effect of withholding relevant information,' courts construe the privilege to apply only where necessary to achieve its purpose." Id. at 810-11 (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)). The Seventh Circuit has described the attorney-client privilege in the following manner:

> The attorney-client privilege is intended to encourage people who find themselves involved in actual or potential legal disputes to be candid with any lawyer they retain to advise them. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The hope is that this will assist the lawyer in giving the client good advice (which may head off litigation, bring the client's conduct into conformity with law, or dispel legal concerns that are causing the client unnecessary anxiety or inhibiting him from engaging in lawful, socially productive activity). ... Communication from a client that neither reflects the lawyer's thinking nor are made for

10

the purpose of eliciting the lawyer's professional advice or other legal assistance are not protected.

United States v. Frederick, 182 F.3d 496, 500 (7th Cir. 1999). In addition to protecting communications from a client to an attorney, communications from an attorney to a client are privileged if the communication constitute legal advice or would directly or indirectly reveal the substance of a client confidence. United States v. BDO Seidman, LLP, No. 02 C 4822, 2004 WL 1470034, at *2 (N.D. Ill. June 29, 2004) (citing United States v. Defazio, 899 F.2d 626, 635 (7th Cir. 1990)). A communication that is covered under the privilege can be conveyed orally or through a variety of written formats including memoranda, letters, emails, facsimiles, summaries and handwritten notes. United States v. BDO Seidman, LLP, No. 02 C 4822, 2004 WL 1470034, at *2-3 (N.D. Ill. June 29, 2004).

The tax practitioner privilege is a statutory creation of Congress. See, e.g., Frederick, 182 F.3d at 500 ("There is no common law accountant's or tax preparer's privilege.") (quoting Couch v. United States, 409 U.S. 322, 335 (1973); United States v. Arthur Young & Co., 465 U.S. 805, 817-19 (1984)). The tax practitioner privilege, codified at I.R.C. § 7525(a)(1), states that "with respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and a federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." I.R.C. § 7525(a)(1).

The tax practitioner privilege is interpreted based on the common law rules of the attorney-client privilege. United States v. BDO Seidman, LLP, 337 F.3d 802, 810-12 (7th Cir. 2003). The communications are made, however, for the purpose of tax advice instead of legal advice, Id. at 811,

11

and the client's communication is with a federal authorized tax practitioner instead of an attorney. The statute defines a "federally authorized tax practitioner" as "any individual who is authorized to practice before the IRS" and "tax advice" means "advice given by an individual with respect to a matter which is within the scope of the individual's authority to practice" as described under the tax practitioners privilege. I.R.C. §§ 7525 (a)(3)(A), (B).

The tax practitioner privilege, like the attorney-client privilege, is not an absolute bar to disclosures, but instead contains limitations on the scope of the privilege. The tax practitioner privilege only applies to communications made on or after statute's enactment date of July 22, 1998. Frederick, 182 F.3d at 502. The language of the statute expressly limits the privilege to "noncriminal tax matters before the IRS," I.R.C. § 7525(a)(2)(A), and "noncriminal tax proceedings in Federal court brought by or against the United States." I.R.C. § 7525(a)(2)(B). The statute also prohibits the application of the tax practitioner privilege to "any written communication between a federally authorized tax practitioner" and client "in connection with the promotion of the direct or indirect participation of the person in any tax shelter (as defined in [I.R.C.] § 6662(d)(2)(C)(ii)). I.R.C. § 7525(b). A tax shelter is defined as "a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, if a significant purpose of such partnership, entity, plan or arrangement is the avoidance or evasion of Federal income tax." I.R.C. § 6662(d)(2)(C)(ii).

The limitations on the attorney-client privilege, such as the crime-fraud exception, are incorporated into the tax practitioner privilege through the application of the common law interpretations of the attorney-client privilege when interpreting the tax practitioner privilege. United States v. BDO Seidman, LLP, 337 F.3d 802, 810 (7th Cir. 2003). Furthermore, the phrase "tax advice," the communication covered under the tax practitioner privilege, "does not include

communication regarding tax return preparation; it simply encompasses communication such as tax planning advice." United States v. BDO Seidman, LLP, No. 02 C 4822, 2003 WL 932365, at *2 (N.D. Ill. Feb. 5, 2003) (citing In re Grand Jury Proceedings, 220 F.3d 568, 571 (7th Cir. 2000); United States v. Frederick, 182 F.3d 496 (7th Cir. 1999); United States v. KPMG LLP, 2002 WL 31894130, at *4 (D.D.C. 2002)).

The work product doctrine, announced in Hickman v. Taylor, 329 U.S. 495 (1947), and codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects against the discovery of documents and other tangible things that would be otherwise be discoverable under the Federal Rules. Fed. R. Civ. P. 26(b)(3). The work product doctrine is a qualified doctrine that is distinct and broader than the attorney-client privilege. Caremark v. Affiliated Computer Servs., Inc. 195 F.R.D. 610, 613 (N.D. Ill. 2000) (citing United States v. Nobles, 422 U.S. 225, 238 n.11 (1975)). "If a party demonstrates that materials in its possession that would otherwise be discoverable were prepared in anticipation of litigation, the materials are considered work product and become subject to a qualified privilege from discovery. The qualified privilege may only be overcome if the party seeking production demonstrates both a substantial need for the materials and that it would suffer undue hardship in prosecuting the requested information some other way." Logan v. Commerical Union Ins. Co., 96 F.3d 971, 976 (7th Cir. 1996). Furthermore, the privilege applies when "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Id. at 976-77 (emphasis in original) (citations omitted).

Upon this court's review of the documents submitted for in camera review and the Intervenors explanations as provided in their memoranda and privilege log, this court finds that the documents submitted by the Intervenors appear to fall within either the attorney-client, tax

practitioner and/or work product privileges. The court shall therefore turn to the arguments made by the government in which it attempts to argue that attorney-client, tax practitioner and work product privileges should not apply.

## 2. The Government's Arguments

The government has provided several arguments against the recognition of privilege for the Intervenors. The government's arguments raise the following issues for the court to address: (1) Are the Intervenors prohibited from making a claim of privilege under the crime-fraud exception to the attorney-client, tax practitioner and/or work product privilege? (2) Does the "No Warranty" language contained in the consulting agreement between BDO and various Intervenors demonstrate that BDO was not providing the type of advice that would implicate either the protections of the attorney-client or tax practitioner privilege? and (3) What is the authoritative weight of the decision of the United States District Court for the Southern District of New York in Denney v. Jenkens & Gilchrist, 340 F. Supp. 2d 338 (S.D.N.Y. 2004), and specifically, must the court follow that decision as it applies to Intervenors Hawkins and Khan under the doctrine of offensive collateral estoppel?

### A. Crime-Fraud Exception

The IRS argues that the Intervenors cannot assert attorney-client privilege, tax practitioner privilege or the work product doctrine because the Intervenors were involved in fraudulent transactions by purchasing illegal tax shelters from BDO and BDO and the Intervenors attempt to inappropriately conceal these transactions from the IRS. The IRS supports its argument by pointing to the decision in Denny v. Jenkens & Gilchrist, where Judge Scheindlin determined that BDO had entered into a mutually fraudulent consulting agreement. 340 F. Supp. 2d 338, 346-47 (S.D.N.Y. 2004). The IRS also provides the declaration of IRS Revenue Agent Sandra Alvelo and a number

14

of documents obtained through the IRS summonses from BDO.

The IRS presents a picture of BDO, along with firms of Jenkens & Gilchrist, ("J&G"), Diversified Group, Inc., Helios, ICA-Bricolage and Gramercy, and Brown and Wood, ("B&W")[5] as a producers, marketers and implementers of allegedly illegal tax shelters. The IRS' argument is that BDO produces financial transactions or "tax products" that it markets to clients who are looking to evade their tax liabilities. By its continual reference to these transactions as "abusive," "pre-packaged," and "cookie cutter," the IRS is attempting to brand BDO as the proprietor of "off-shelf" prepackaged retail tax shelters sold to the Intervenors for the singular unlawful purpose of evading tax liability.

In essence, the IRS alleges that everything done by BDO, the third party law firms and the Intervenors in these transactions, under the guise of a legitimate business purpose, is nothing more than an attempt to cover-up the unlawful purpose of the tax shelters. The IRS asserts this type of cover-up is necessary because the allegedly illegal tax shelters produced and marketed by BDO are the same or substantially the same as ones that have been previously determined to have been abusive in published IRS notices. The IRS concludes that since BDO and the Intervenors must be aware of the illegal nature of BDO's tax products, BDO and the Intervenors must be engaged in a practice of concealing its illegal activities and this deprives them of the benefits of attorney-client, tax practitioner and work-product privileges under the crime-fraud exception.

"Under the crime-fraud exception, communications that would otherwise be protected by the attorney-client privilege, [as well as tax practitioner privilege], lose their protected status if they were 'made for the purpose of getting advice for the commission of a fraud or crime.'" United States v.

---

[5]The law firm of Brown & Wood is now known as Sidley Austin Brown & Wood LLP.

Segal, No. 02 CR 112, 2004 WL 830428, at *1 (N.D. Ill. Apr. 16 2004) (quoting United States v. Zolin, 491 U.S. 554, 563 (1989)). "The crime-fraud exception applies where the party attempting to circumvent the privilege, [in the present case the IRS,] can meet the following test: (1) a prima facie showing of [a crime or] fraud, and (2) the communications in question are in furtherance of the misconduct." Vardon Golf Co., Inc. v. Karsten Mfg. Corp., 213 F.R.D. 528, 535 (N.D. Ill. 2003) (citing Pandick, Inc. v. Rooney, No. 85 C 6779, 1988 WL 61180, at *2 (N.D. Ill. June 2, 1988)).

> As the Seventh Circuit explained in United States v. Davis,
>
> [T]o drive away the privilege ... there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact. When the evidence is supplied, the seal of secrecy is broken. [The Seventh Circuit has] also noted that prima facie evidence did not mean enough to support a verdict in favor of the person making the claim. Instead [the Seventh Circuit has] held that a party has established a prima facie case whenever it presents evidence sufficient to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation. [The Seventh Circuit has] also stated that if the district court finds such an explanation satisfactory the privilege remains and that the district court's decisions regarding these matters may be disturbed only for an abuse of discretion.

1 F.3d 606, 609 (7th Cir. 1993) (internal quotations and citations omitted).

The court, after reviewing documents presented in IRS Agent Alvelo's declarations and the arguments presented in the IRS' briefs, finds that the IRS has not presented a prima facie case that BDO and the Intervenors are engaging in fraudulent or criminal activity in the general pattern alleged by the IRS. The court is not prepared to accept the far reaching and blanket assertions made by the IRS at this time. Accord United States v. Arthur Andersen, L.L.P, 273 F. Supp. 2d 955, 960-61 (N.D. Ill. 2003) (noting that the IRS' argument for the crime-fraud exception in that case was "at the best bootstrapping") amended on other grounds No. 02 C 6790, 2003 WL 21956404 (N.D. Ill. Aug. 15, 2003).

As this court concluded in its review of the IRS' crime-fraud exception argument in its June

29, 2004 opinion, "the government has based its arguments for the application of the crime-fraud exception on what to this point is speculation and innuendo." No. 02 C 4822, 2004 WL 1470034, at *4. Although the government provides various documents, it continues to provide significant speculation as to BDO and the Intervenors' motives and activities.

The fact that the IRS characterizes a business or individual's transactions as abusive and unlawful cookie cutter tax shelters does not mean that this characterization is a proper conclusion as a matter of law. Instead, "the issue of whether [BDO] organized or sold tax shelters" in violation of the law is a "complicated question." United States v. Sidley Austin Brown & Wood, LLP, No. 03 C 9355, 2004 WL 905930, at *6 (N.D. Ill. Apr. 28, 2004). As this court noted when the IRS argued for the crime-fraud exception in the June 29, 2004 opinion, the tax code and underlying regulations is full of complexities and uncertainties. No. 02 C 4822, 2004 WL 1470034, at *4. The question of whether the Intervenors and BDO engaged in unlawful activity, or alternative properly complied with the tax code, is one of the ultimate questions for this litigation. A determination by this court that BDO and the Intervenors engaged in fraudulent and criminal activity, based on the lack of evidence presented by the IRS at this time, would be premature and would place the proverbial "Cart before the Horse."[6]

Although this court is unwilling to hold as a blanket matter that the Intervenors are barred from bringing privilege claims under the crime-fraud exception, the court will consider, as it did in its June 29, 2004 opinion, whether the crime-fraud exception should be applied when reviewing in camera the individual documents. This court cannot deprive the Intervenors, at this time, of the right

---

[6] On this basis and for the same reasons, the court cannot say as a matter of law, at this stage in the litigation, that BDO and the Intervenors are engaging in tax shelters, as defined under I.R.C. § 6662(d)(2)(C)(ii), that would require the application of the exception to the tax practitioner privilege under I.R.C. § 7525(b).

to assert a claim of privilege, but this court will consider whether the crime-fraud exception should be applied on a document-by-document basis for each document pertaining to the each Intervenor's activities reviewed by the court in camera.

The IRS suggests that the court should consider the following to be indications of fraud that could be sufficient to support a prima facie showing of fraud: (1) the marketing of pre-packaged transactions by BDO;[7] (2) the communication by the Intervenors to BDO with the purpose of engaging in a pre-arranged transaction developed by BDO or third party with the sole purpose of reducing taxable income; (3) BDO and/or the Intervenors attempting to conceal the true nature of the transaction; and (4) knowledge by BDO, or a situation where BDO should have known, that the Intervenors lacked a legitimate business purpose for entering into the transaction.

The court will consider the IRS' suggested indicators of potential fraud during the court's in camera review of the documents. These factors, although they will be considered by the court, are not dispositive on the question of whether a crime-fraud exception applies because the court must make its own independent determination as to whether there is sufficient evidence to show that "(1) a prima facie showing of [a crime or] fraud, and (2) the communications in question are in furtherance of the misconduct." Vardon Golf Co., Inc. v. Karsten Mfg. Corp., 213 F.R.D. 528, 535 (N.D. Ill. 2003).

Furthermore, this court will also considered the current regulatory environment in which the IRS, accounting and consulting firms and taxpayers currently interact when reviewing the documents

---

[7] The IRS continues its argument that BDO was providing prepackaged transactions in the IRS' sur-reply which points to the fact that opinion letters provided to different Intervenors were identical. The use of an identical document, however, does not mean that BDO was not providing individualized advice. The use form or boiler-plate document, which are often used as the basis in providing professional services, is not by itself evidence of a fraud but as the court discusses later a factor that the court shall consider within the totality of the circumstances.

to determine whether a prima facie case for the crime-fraud exception is presented in each individual document. A number of cases have been recently brought in the federal courts attempting to address whether transactions produced and marketed by accounting, consulting and law firms were abusive tax shelters in violations of the tax code. Some of these cases address questions of privilege and the crime-fraud exception while others, although involving the factual question of tax shelters, involved legal issues unrelated to the question of privilege. The court does not find any of one case to be controlling on the question of whether the Intervenors are barred from asserting privilege under the crime-fraud exception. However, the court shall briefly discuss three of these cases that provide a background from which the court can draw to identify potential indicators of fraud that could lead to a finding of prima facie showing of a crime-fraud and communication in furtherance of the crime-fraud.

### i. Denney v. Jenkens & Gilchrist and Miron v. BDO Seidman, LLP

The IRS has invited the court's attention to Denney v. Jenkens & Gilchrist, 340 F. Supp. 2d 338 (S.D.N.Y. 2004), in support of its claim of a blanket application of the crime-fraud exception to all of the Intervenors' privilege claims. This court has previously considered and rejected the application of Denney during the IRS's argument for a blanket application of the crime-fraud exception in the June 29, 2004 opinion. No. 02 C 4822, 2004 WL 1470034, at *4. The court again considered the Denney case in this opinion when in it ultimately concluded that the IRS has not provided evidence sufficient to require the court to impose a blanket application of the crime-fraud exception. Although the Denney case does not give sufficient evidence to automatically deprive the Intervenors of privilege under the crime-fraud exception, it does provide guidance for indicators of fraudulent activity that the court may identify during its document-by-document in camera review.

The Denney case involves a civil RICO class action lawsuit brought by former clients of various professional firms including BDO. 340 F. Supp. 2d at 340-41. The question before the Denney court was whether the court should grant the defendants' motion to compel arbitration. Id. As this court noted in June 29, 2004 opinion, the factual background presented in the Denney case was taken from the plaintiffs' complaint. No. 02 C 4822, 2004 WL 1470034, at *2 ("The plaintiffs in Denney allege, inter alia, that the law firm and accounting firm, including BDO, defendants were co-promoters of tax shelters. As BDO correctly points out, allegations in a complaint are merely that - allegations."). The Denney court did, however, conclude that since BDO had entered into a mutually fraudulent consulting agreement, BDO could not invoke the arbitration clause consulting agreements and therefore the Denney court denied the defendants' motion to compel arbitration. 340 F. Supp. 2d at 345-47.

The Denney court explained its finding in the following manner:

> Based on the representations by counsel for plaintiffs and BDO, as well as the extraordinary vague language contained in the consulting agreements, I conclude that BDO and plaintiffs engaged in mutual fraud when they executed the consulting agreements. It appears that neither plaintiffs nor BDO wanted any third party to know the nature of the contracts into which they entered, or that BDO had contracted with plaintiffs to provide tax shelter advice. As a result, they entered into agreements that described consulting work that was never performed and that was different from the consulting services that were actually provided. This conclusion is supported by the statements of counsel during the April 14, 2004 telephone conference, as well as the fact that while BDO apparently never provided any services to plaintiffs other than tax shelter advice, plaintiffs paid BDO in accordance with the consulting agreements.

Id. at 346-47. The Denney court in a footnote characterized the arrangement as one where "both sides were in on the wink and the nod." Id. at 346 n.9.

It is important to note that just because one of BDO's consulting agreements has been found to have fraudulent does not mean that all consulting agreements entered into by BDO were fraudulent. This principle was illustrated in the decision of the Eastern District of Pennsylvania in

Miron v. BDO Seidman, LLP, 342 F. Supp. 2d 324, 329-30 (E.D. Pa. 2004). That case also considered the question of whether the court should enforce an arbitration clause contained in a consulting agreement between BDO and one of its former clients. The Miron court considered the Denney court's conclusion and instead arrived at the opposite result of finding that the arbitration clause was valid and enforceable holding that "the record in this case does not suggest a mutual intent into a fraudulent agreement." Id. at 330.

Upon a review of the Denney and Miron decisions, the court concludes that potential indicators of fraud include: (1) a vaguely worded consulting agreement between BDO and the Intervenor, and (2) BDO's failure to provide services required under the consulting agreement while still receiving payment from the Intervenor. Furthermore, the Denney and Miron cases involved an alleged tax shelter called the "Currency Options Bring Reward Alternative." ("COBRA") As this court previously noted, the Denney and Miron cases did not consider the question of whether COBRA was a tax shelter. However, in light of fact that BDO's former clients are alleging in two separate cases that COBRA is a tax shelter, this court will consider references in the document to COBRA transaction as an indicator of potential fraud.

The court's consideration of potential fraud that it may identify in its review of the documents is tempered by an understanding that the alignment of the parties in Denney and Miron are different from the parties in the present case. BDO's former clients and BDO were opposing parties in Denney and Miron while in the present case BDO and its clients, the Intervenors, are aligned against the IRS. In Denney and Miron, it was the former BDO clients who were alleging that BDO engaged in fraudulent activity while in the present case it is the government, and not BDO's clients, who is alleging wrong doing. Furthermore, Judge Scheindlin obtained what she construed

21

to be an admission of the fraudulent activity from counsel from both sides in the <u>Denney</u> case, 340 F. Supp. 2d at 346 n.9, while BDO and the Intervenors both deny fraudulent activity in the present case.

### ii. United States v. KPMG

A second case that the court will draw upon in determining whether evidence exists of potential fraudulent activity is <u>United States v. KPMG</u>. 316 F. Supp. 2d 30, 40 (D.D.C. 2004). In <u>KPMG</u>, the District Court for the District of Columbia concluded that opinion letters produced by the law firm of Brown & Wood were "boiler-plate templates that are almost, if not completely, identical except for date, investor name, investor advisor and dates and amounts of investment transactions." <u>Id.</u> The court shifted the burden to KPMG to demonstrate that the letters were indeed legal advice instead of "nothing more than an orchestrated extension of KPMG's marketing machine." <u>Id.</u>

This court considered the <u>KPMG</u> case in its June 29, 2004 opinion. In that opinion, this court held that "evidence of "coordinated partnership between BDO and the [outside law firms] was lacking." No. 02 C 4822, 2004 WL 1470034, at *2. Consequently, this court held that the evidence was not sufficient to label the outside law firms as co-promoters and therefore rejected the government's efforts to remove the protection of the attorney-client relationship. <u>Id.</u>

As with the <u>Denney</u> case discussed above, the court has examined the <u>KPMG</u> case in terms of the potential indicators of fraud that the court should look for when performing an <u>in camera</u> inspection of the submitted documents to determine whether the government can meet the <u>prima facie</u> test on an individual document-by-document basis. The <u>KPMG</u> court focused on the boiler-plate nature of the "opinion letters" provided by outside law firms to KPMG's clients. 316 F. Supp.

2d at 40. The idea of a boiler-plate letter fits within the government's overall allegation that BDO and the associated law firms are not providing individualized advice but instead are providing the product of a tax shelter.

### iii.  Summary of Potential Indicators of Fraud that the Court Looked for During the In Camera Review of the Submitted Documents

In summary, the court has considered the following to be potential indicators of fraud when it performed the in camera review of the submitted documents to determine whether there is sufficient evidence to support a prima facie showing of fraud: (1) the marketing of pre-packaged transactions by BDO; (2) the communication by the Intervenors to BDO with the purpose of engaging in a pre-arranged transaction developed by BDO or third party with the sole purpose of reducing taxable income; (3) BDO and/or the Intervenors attempting to conceal the true nature of the transaction; (4) knowledge by BDO, or a situation where BDO should have known, that the Intervenors lacked a legitimate business purpose for entering into the transaction; (5) vaguely worded consulting agreements; (6) failure by BDO to provide services under the consulting agreement yet receipt of payment; (7) mention of the COBRA transaction; and (8) use of boiler-plate documents. The court does not limit itself to the indicators in determining whether a prima facie case for the application of the crime-fraud exception.  Instead, this court looks to the "totality of the circumstances," United States v. BDO Seidman LLP, No. 02 C 4822, 2002 WL 32080709 (7th Cir. Dec. 18, 2002), surrounding each document in order to determine whether there is "something to give colour to the charge ... so as to require the [Intervenors], the one[s] with superior access to the evidence and in the best position to explain things, to come forward with that explanation. United States v. Davis, 1 F.3d 606, 609 (7th Cir. 1993) (internal quotations and citations omitted). Furthermore, its important note that an indication of potential fraud does not mean that fraud exists

sufficient for a prima facie finding. These factors are merely guideposts to assist this court in its in camera evaluation.

### iv. Results of the Court's In Camera Inspection of the Submitted Documents

The court's in camera review of the documents submitted by the Intervenors, based on the totality of the circumstances and with consideration of the potential indicators of fraud outlined above, the court identified only one document providing a "foundation of fact," United States v. Davis, supra, 1 F.3d at 609, upon which this court can find that a prima facie case for the crime-fraud exception had been established. This document is A-40.[8] The court is specifically concerned with what is stated in the first sentence of the second paragraph in the email contained on page 2 of A-40 (Bates Number 11 BDO P00003428), but the Intervenors' explanation should cover the entire document not just one sentence. The burden is now on Intervenor Robert Cuillo, and any other Intervenor that asserts privilege as to this document, to provide an explanation as to why this document should not be disclosed to the government under the crime-fraud exception.

Of the remaining 266 documents where the court has not found evidence sufficient to hold that a prima facie case exists requiring an explanation from an Intervenor, a dozen of the other documents contained one of the eight indicators or some other indicator of potential fraud. Some documents made reference to calculation of commissions based on a percentage of the total transaction, discussed some of the activities as "financial products," use of "boiler-plate opinions,"

---

[8] The privilege log states that Document A-40 is an e-mail sent from BDO employee Michael Kerekes to BDO employees Robert Greisman and Lawrence Cohen and a copy was provided to Paul Shanbrom. The document's Bates Range is 11 BDO P 00003427-00003429. This document is related to Intervenor Robert Cuillo but the privilege log also states that it is listed to multiple clients.

providing "tax solutions" and tracking various "deals."[9]

Despite these indicators, the court is not prepared at this time to conclude as Judge Hogan did in United States v. KPMG, that BDO and the associated law firms were not giving advice, but instead were providing documents that were nothing more than "orchestrated extensions" of the accounting and law firms' "marketing machine." 316 F. Supp. 2d 30, 40 (D.D.C. 2004). Nor is the court ready to conclude that under the totality of the circumstances their appears "a wink and a nod," Denney, 340 F. Supp. 2d at 346 n.9, between BDO, the law firms and the Intervenors so as to require a prima facie finding of crime-fraud for any of other documents. For the remaining 254 documents, this court found no indications of anything that might suggest that the crime- fraud exception might apply.

B. "No Warranty" Language

This court previously considered the impact of "No Warranty" language contained in consulting agreements between a number of the Intervenors and BDO in the February 5, 2003 decision. No. 02 C 4822, 2003 WL 932365 (N.D. Ill. Feb. 5, 2003) aff'd, 337 F.3d 802 (7th Cir. 2003), cert. denied sub nom. 124 S. Ct. 1410 (2004). In the February 5, 2003 opinion, this court held that "the 'No Warranty' language makes the relationship defined by the 'Consulting Agreement' to be different than the common law taxpayer-attorney relationship" and therefore the Does and Roes who's "Consulting Agreement" contained the "No Warranty" type language could not assert the § 7525 tax practitioner privilege to protect from the disclosure of their identities." Id. at *3-4.

The IRS' concurrence in the Intervenors' Motion to Intervene and Challenge to Claims of

---

[9] The twelve documents containing one of these references are A-3, A-32, A-36, N-1, N-6, O-23, P-10, Q-15, Q-17, Q-22, Q-25, R-8, R-18. The court does not find these references because of their context to provide "the foundation in fact" to compel a further requisite explanation by the Intervenors to which the documents pertain.

Privilege (Dkt. No. 129), filed July 14, 2004 draws the court back to its ruling on the impact of the "No Warranty" language contained in the "Consulting Agreements" on the Intervenors' current assertion of privilege. The IRS asserts that Intervenor Robert S. Cuillo, (Id. at 2-3), Richard Garman, (Id. at 6), Jai N. Gupta, (Id. at 8), Dwayne Hawkins, (Id. at 9), Shahid Khan, (Id. at 10-11), Arlene Nussdorf, (Id. at 13-14), Glenn Nussdorf, (Id.), Glenn Nussdorf Trust, (Id.), Ruth Nussdorf, (Id.), Stephen Nussdorf, (Id.), and Quality King (Id.), entered into consulting agreements with the "No Warranty" language that this court has previously determined to deprive the Intervenors of privilege under § 7525.

The IRS' position is that this court's "No Warranty" holding in the February 5, 2003 opinion fits into the IRS' overall view that BDO and the associated law firms were not providing advice but instead a "cookie cutter" tax shelter. As the IRS argued in its August 27, 2004 brief, "BDO was not providing tax advice [thus the inclusion of the "No Warranty" language] because [BDO] was in the business of marketing pre-packaged tax shelters. No confidential communication from the customer [the Intervenor] was necessary or expected because all the customer had to do was determine the amount of the elimination that he wished to purchase." (Dkt. No. 135 at 9.) Thus, the IRS argues that Intervenors Cuillo, Garman, Gupta, Hawkins, Khan, Arlene Nussdorf, Glenn Nussdorf, Glenn Nussdorf Trust, Ruth Nussdorf, Stephen Nussdorf, and Quality King are prohibited from asserting any type of privilege.

The Intervenors respond that this court's decision on the "No Warranty" language in the February 5, 2003 opinion does not deprive the Intervenors of privilege in the present matter because this court's holding on the "No Warranty" language only applies to the writing of tax opinions. (Dkt. No. 139 at 10). The Intervenors contrast the writing of tax opinions to "pre-transactional tax

advice," which the Intervenors claim to have received and which they claim is covered under the privileges. (Id.)

This court did not make a distinction in the February 5, 2003 opinion, as the Intervenors suggest, between "tax opinions" and "pre-transactional tax advice." That issue was not considered by the court because the purpose the February 5, 2003 memorandum opinion and findings was to create the further findings as instructed by the Seventh Circuit in its limited remand. Nos. 02-3914, 02-3915, 2002 WL 32080709 at *1 (7th Cir. Dec. 18, 2002). This court also notes that the Seventh Circuit did not discuss the validity of the court's determinations of the "No Warranty" language in its July 23, 2003 opinion. 337 F.3d 802 (7th Cir. 2003). Instead, the court arrived at a decision based on other arguments. Id. at 810-13. Furthermore, this court's February 5, 2003 opinion only considered the question of whether the Intervenors' privilege claim prevented a disclosure of document that would disclose their identity while in this case the Intervenors are objecting to the disclosure of underlying communications contained within these documents. Thus, it appears to the court that the parties are presenting a new argument, or perhaps the extension of a prior ruling from this court to new factual issues previously not considered by this court, when they argue as to the impact of the "No Warranty" language to the Intervenors' current privilege claims.

When this court performed the tasks it was instructed to perform by the Seventh Circuit during the limited remand in 2003, it reviewed confidentiality agreements, consulting agreements and engagement letters. Now this court has been presented with different types of documents such as memorandums, letters and emails. Upon examining these documents, it appears that the Intervenors have engaged in a business relationship with BDO to receive tax advice. There are no tax returns in the in camera documents nor are there any documents that appear to be used in the

27

preparation of tax returns. Thus, unlike this court's decision on February 3, 2003, where this court held that the "No Warranty" language established a relationship different than the common law taxpayer-attorney relationship, and therefore denied the application of privilege, United States v. BDO Seidman LLP, No 02 C 4822, 2003 WL 932365, at *3-4 (N.D. Ill. Feb. 5, 2003), the communications occurring between the Intevenors, BDO and their lawyers appears to this court, at this point in the litigation, to fall squarely within the type of tax and legal advice protected under the tax practitioner and attorney-client privileges.

### C. Denny Case Impact

IRS also argues that this court is bound by Judge Scheindlin's decision in the Denny case, 340 F. Supp. 2d 338 (S.D.N.Y. 2004), as it applies to Intervenors Hawkins and Khan. According to the government, the Denny case involved virtually identical facts to this case and since Hawkins and Khan were involved in the Denny case, the doctrine of offensive collateral estoppel requires the application of Judge Scheindlin's finding of fraudulent activity in that case to the present case.

As discussed above, the Denny case deals with different factual issues from the present case. That case involved a civil suit between BDO and its former clients while this case involves the IRS' investigation of BDO and its clients. Furthermore, the fact that BDO has entered into a fraudulent activity or even an Intervenor has admitted into entering into a fraudulent activity in one case does not mean that all of their activities are now fraudulent in all cases. From this court's reading of the Denny decision and this court's review of the documents provided for in camera inspection, the activities evaluated by Judge Scheindlin in the Denny decision are different from the activities this court has been required to scrutinize in this case.

## CONCLUSION

For the reasons set forth above, the documents submitted to the court for in camera review, with the exception of document A-40, are held to be privileged and need not be disclosed to the government. This order covers the documents submitted on the Intervenors Amended Privilege Log of September 10, 2004 (Dkt. No. 142), and the two supplemental documents provided by Intervenors R.K. Lowry, Jr. and John P. Moffitt on August 23, 2004. (Dkt. No. 137).

The court holds, based on its in camera review, that a prima facie case for the application of the crime-fraud exception has been established for document A-40. The burden is now upon Intervenor Robert Cuillo, and any other Intervenors who believes that they have a privilege in this document, to come forward with an explanation as to why the document should not be disclosed to the government under the crime-fraud exception. This explanation by any Intervenors must be filed with the court by April 14, 2005. The government response is due April 28, 2005 and the Intervenors' reply is due May 10, 2005.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN
United States District Judge

DATE: March 30, 2005